Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY DOMULOT, derivatively on behalf of SKYE BIOSCIENCE, INC., <br><br> Plaintiff, <br><br> v. <br><br> PUNIT DHILLON, KAITLYN ARSENAULT, DEBORAH CHARYCH, PAUL GRAYSON, ANNALISA JENKINS, ANDREW J. SCHWAB, KAREN SMITH, and CHRISTOPHER TWITTY, <br><br> Defendants, <br><br> and <br><br> SKYE BIOSCIENCE, INC., <br><br> Nominal Defendant. | Case No.: **'26CV600  WQHAHG** <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

## INTRODUCTION

Plaintiff Randy Domulot ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Skye Bioscience, Inc. ("Skye Bioscience" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Punit Dhillon ("Dhillon"), Kaitlyn Arsenault ("Arsenault"), Deborah Charych ("Charych"), Paul Grayson ("Grayson"), Annalisa Jenkins ("Jenkins"), Andrew J. Schwab ("Schwab"), Karen Smith ("Smith"), and Christopher Twitty ("Twitty") (collectively, the "Individual Defendants," and together with Skye Bioscience, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Skye Bioscience, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Dhillon, Arsenault, and Twitty. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Skye Bioscience, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 4, 2024, through October 3, 2025 (the "Relevant Period").

2.      Skye Bioscience is a clinical stage biotechnology company that develops new mechanisms, drugs, and therapies targeted at treating obesity and related metabolic conditions. In particular, the Company is focused on developing next-generation molecules that modulate G-protein-couple receptors ("GPCRs").

3.      The Company's lead product candidate is nimacimab. Nimacimab is a peripherally restricted negative allosteric modulating antibody that targets the cannabinoid receptor type-1, also known as the CB1 receptor. The CB1 receptor is a GPCR involved in metabolic processes, specifically metabolic regulation.

4.      On August 22, 2024, the Company initiated its Phase 2a proof-of-concept clinical trial, "CBeyond." The CBeyond clinical trial was randomized, double-blind, and placebo controlled. It spanned twenty-six weeks and included a thirteen-week follow-up. CBeyond's primary endpoint was to evaluate weight loss using the Company's lead product candidate, nimacimab, compared to a placebo.

5.      Throughout the Relevant Period, the Individual Defendants assured investors of nimacimab's efficacy and emphasized its purported differentiated primary mechanism of action—claiming it "goes beyond suppression of food intake"— based on the supposed outcomes of the Company's other including its preclinical studies. However, these rosy representations failed to disclose, *inter alia*, that the purported outcomes of the Company's other studies on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial.

6.      The truth emerged on October 6, 2025 when the Company published a press release revealing the outcomes of the CBeyond clinical trial, which notably failed to meet CBeyond's primary endpoint. Specifically, the press release stated that "the nimacimab monotherapy arm did not achieve the primary endpoint of weight loss compared to placebo[.]"

7.      On this news, the price of the Company's stock fell $2.85 per share, or 60%,

from a closing price of $4.75 on October 5, 2025 to close at $1.90 per share on October 6, 2025.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the purported outcomes of the Company's other studies on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial; (2) the efficacy of nimacimab was less than the Individual Defendants claimed it to be; and (3) the Individual Defendants overstated the clinical, regulatory, and commercial prospects of nimacimab. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading.

9.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.    Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $1.8 million.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Financial Officer ("CFO"), its Chief Scientific Officer ("CSO"), and its Chief Executive Officer ("CEO") and director to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California

(the "Securities Class Action")[1], and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Dhillon's, Arsenault's, and Twitty's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## <u>JURISDICTION AND VENUE</u>

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

---

[1] The Securities Class Action was filed on September 17, 2025, under the caption *Stout v. Skye Bioscience, Inc. et al*, Case No. 3:25-cv-03177 (S.D. Cal.).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because Skye Bioscience's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.    Plaintiff is a current shareholder of Skye Bioscience. Plaintiff has continuously held Skye Bioscience common stock at all relevant times.

### Nominal Defendant Skye Bioscience

20.    Skye Bioscience is a Nevada corporation with its principal executive offices located at 11250 El Camino Real, Suite 100, San Deigo, California 92130. Skye Bioscience's common stock trades on the on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "SKYE."

### Defendant Dhillon

21.    Defendant Dhillon has served as the Company's President and CEO since August 2020. Defendant Dhillon has also served as a Company director since January 2018. In addition, from December 2019 to October 2024, Defendant Dhillon served as the Chairman of the Board.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Dhillon made the following sales of Company common stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|----------------------|----------|
| November 15, 2024 | 364 | $5.55 | $2,020.20 |
| November 18, 2024 | 82,546 | $4.99 | $411,904.54 |

Thus, in total, before the truth emerged, Defendant Dhillon sold 82,910 shares of Company common stock on inside information, for which he received approximately $413,925 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Schedule 14A the Company filed with the SEC on April 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Dhillon:

> ***Punit Dhillon*** currently serves as a member of the Board of Directors and as the Company's President and Chief Executive Officer. Mr. Dhillon was appointed as a member of the Board of Directors in January 2018. From December 2019 until October 2024, Mr. Dhillon was the Chairman of the Board of Directors. In August 2020, Mr. Dhillon was appointed as the Company's Chief Executive Officer. Mr. Dhillon was the co-founder and former President & CEO of OncoSec Medical, Inc. (NASDAQ: ONCS), a biopharmaceutical company developing cancer immunotherapies for the treatment of solid tumors, where he served as an executive until March 2018 and as a director until February 2020. He led OncoSec through over $250 million in capital raised, NASDAQ listing and launched the registration study, KEYNOTE695, of their proprietary immunotherapy product for melanoma in combination with Keytruda, based on a drug collaboration with Merck. Prior to that, from September 2003 to March 2011, Mr. Dhillon served as Vice President of Finance and Operations at Inovio Pharmaceuticals, Inc. (NASDAQ: INO), a DNA vaccine development company. Collectively, Mr. Dhillon has led and assisted in raising over $500 million through financings and mergers and acquisitions deals, as well as several licensing and development transactions with large pharmaceutical companies including Merck & Co., Inc. (NYSE: MRK), Bristol Myers Squibb Co (NYSE: BMY), and Pfizer Inc. (NYSE: PFE). Mr. Dhillon also co-founded and is the director of YELL Canada, a registered Canadian charity that partners with schools to support entrepreneurial learning.
>
> Mr. Dhillon received his Bachelor of Arts Honors degree in Political Science with a minor in Business Administration from Simon Fraser University.
>
> We believe Mr. Dhillon's experience in the biotechnology and pharmaceutical industry and his experience with publicly traded companies give him the qualifications necessary to serve as an officer and director of the Company.

**Defendant Arsenault**

24.     Defendant Arsenault has served as the Company's CFO since October 2021.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Arsenault made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|----------------------|----------|
| November 15, 2024 | 190 | $5.55 | $1,054.50 |
| November 18, 2024 | 43,206 | $4.99 | $215,597 |

Thus, in total, before the truth emerged, Defendant Arsenault sold 43,396 shares of Company common stock on inside information, for which she received approximately $216,652 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

26.     The 2025 Proxy Statement stated the following about Defendant Arsenault:

***Kaitlyn Arsenault, CPA***, was appointed as the Company's Chief Financial Officer in October 2021. From 2014 to 2021, Ms. Arsenault served as the President of KA Consulting, Inc., a registered public accounting firm in San Francisco, CA, providing independent technical accounting, financial reporting and consulting advisory services for public and private companies in the pharmaceutical, life sciences, technology, artificial intelligence and FinTech industries. During this time, Ms. Arsenault guided various companies through audit and IPO preparation projects, including the implementation and disclosure of new accounting pronouncements. From September 2016 to October 2021, she served as the Company's Head of Financial Reporting and Technical Accounting consultant. Ms. Arsenault's experience related to complex equity financings, derivatives, debt instruments, stock-based compensation, revenue recognition, and mergers and acquisitions, allows her to bring valuable perspective to structuring viable business transactions with a focus on operational efficiency and reducing administrative burden. Since joining Skye, Ms. Arsenault has led the Company through two back to back acquisitions, multiple financings, capital restructuring activities and the direct listing from the OTC to Nasdaq. Prior to becoming an independent financial consultant, Ms. Arsenault spent seven years in public accounting at Friedman

LLP's (now CBIZ, Inc.) SEC practice as an auditor where she obtained public and private company experience across multiple industries. Ms. Arsenault received her Bachelor of Science degree in Accounting from Ramapo College of New Jersey and is a Certified Public Accountant in California (active) and New Jersey (inactive).

**Defendant Charych**

27.    Defendant Charych has served as a Company director since February 2023 and also serves as Chair of the Nominating and Corporate Governance Committee.

28.    The 2025 Proxy Statement stated the following about Defendant Charych:

***Deborah Charych, Ph.D.***, has served as member of our Board of Directors since February 2023. From October 2018 to September 2022, Dr. Charych served as the Co-Founder, Chief Technology Officer, and Advisor of RayzeBio, Inc, an oncology company focused on the targeted delivery of radionuclides. Dr. Charych conceived and led the scientific and operational R&D strategy for RayzeBio, acquired by BMS for $4.1 billion, leading a successful Series A financing and launch in August 2020, as well as subsequent Series B, C, and D rounds. Prior to launching RayzeBio, Dr. Charych held a number of scientific leadership positions in biotech companies focused on translational drug development. From 2017 to 2019, she founded Third Rock Ventures, creating new biotech companies based on strong science, co-founding Maze Therapeutics, which focuses on harnessing the power of human genetics, functional genomics, and data science to advance our understanding of how to more effectively treat patients with severe rare and common diseases. From 2010 to 2018, Dr. Charych served as Executive Director of Preclinical and Translational Research at Nektar Therapeutics. At FivePrime Therapeutics from 2007 to 2010, Dr. Charych was the Director of Biologics Process Development/CMC/Protein Chemistry. From 1998 to 2006, while at Chiron Corporation, she initiated and led a large proteomics effort to guide oncology target discovery, including the discovery of peptide-mimetic binders ('peptoids'). During her time at Lawrence Berkeley National Laboratory from 1993 to 1998, she assumed an academic leadership role as a tenured Principal Investigator, focusing on new biomaterials. Dr. Charych earned a PhD in Physical Chemistry from the University of California in Berkeley, CA and a B.S. in Chemistry from Carnegie- Mellon University in Pittsburgh, PA.

We believe Dr. Charych's education and significant experience with a wide variety of life science companies give her the qualifications and skills necessary to serve as a director of the Company.

**Defendant Grayson**

29.    Defendant Grayson has served as a Company director since August 2023 and as Chairman of the Board since October 2024. Defendant Grayson also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Grayson made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| November 15, 2024 | 307 | $5.55 | $1,703.85 |
| November 18, 2024 | 86,244 | $4.99 | $430,357.56 |

Thus, in total, before the truth emerged, Defendant Grayson sold 86,551 shares of Company common stock on inside information, for which he received approximately $432,061 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.    The 2025 Proxy Statement stated the following about Defendant Grayson:

***Paul Grayson*** has served on our Board of Directors since the closing of our merger with Bird Rock Bio, Inc. ("Bird Rock Bio") in August 2023. Mr. Grayson was appointed as Chairman of the Board of Directors in October 2024. Mr. Grayson has served as President and Chief Executive Officer [and director] of Radionetics Oncology, Inc., a clinical stage biotechnology company focused on novel radiopharmaceutical products, since November 2023. From July 2020 to November 2023, Mr. Grayson served as President and Chief Executive Officer of Tentarix Biotherapeutics Inc., a biotechnology company. Mr. Grayson served as President and Chief Executive Officer of Bird Rock Bio, a clinical stage biopharmaceutical company, from June 2011 until its acquisition by the Company in August 2023. From November 2019 to July 2020, Mr. Grayson also served as a partner at Versant Ventures, a venture capital firm. Mr. Grayson received a Bachelor of Arts in Biochemistry

and Computer Science from the University of California, Los Angeles and a Master of Business Administration from the University of California, Irvine.

We believe Mr. Grayson's extensive experience in the biotechnology industry give him the qualifications and skills necessary to serve as a director of the Company.

**Defendant Jenkins**

32.    Defendant Jenkins has served as a Company director since February 2024. Defendant Jenkins also serves as Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

33.    The 2025 Proxy Statement stated the following about Defendant Jenkins:

***Annalisa Jenkins, MBBS, FRCP***, has served as a member of our Board of Directors since February 2024. From November 2017 until April 2019, Dr. Jenkins served as the Chief Executive Officer of PlaqueTec Ltd., a biotechnology company focusing on coronary artery disease treatment and prevention. Previously, Dr. Jenkins served as the Chief Executive Officer and a member of the board of directors of Dimension Therapeutics, Inc. (Nasdaq: DMTX), a gene therapy company focused on rare and metabolic diseases associated with the liver, from September 2014 until its sale to Ultragenyx Pharmaceutical Inc. (Nasdaq: RARE) in November 2017. From October 2013 to March 2014, Dr. Jenkins served as Executive Vice President, Head of Global Research and Development for Merck Serono Pharmaceuticals, a biopharmaceutical company. Previously, from September 2011 to October 2013, she served as Merck Serono's Executive Vice President, Global Development and Medical, and was a member of Merck Serono's executive committee. Prior to that, Dr. Jenkins pursued a 15-year career at Bristol-Myers Squibb Company, a biopharmaceutical company, where, from July 2009 to June 2011 she was a Senior Vice President and Head of Global Medical Affairs. Dr. Jenkins is currently a non-executive director of Genomics England. Dr. Jenkins serves on the board of directors of Affimed GmbH (Nasdaq: AFMD), Mereo BioPharma Group plc (Nasdaq: MREO), Compass Pathways PLC (Nasdaq: CMPS) and a number of privately held biotechnology and life science companies, including the board of directors of four privately listed European based fund platforms investing into the life sciences sector. Previously within the past five years, Dr. Jenkins served on the board of directors of Ardelyx, Inc. (Nasdaq: ARDX), AgeX Therapeutics, Inc. (NYSE American: AGE), Avrobio, Inc. (Nasdaq: AVRO) and Oncimmune Holdings plc (LSE: ONC). Dr. Jenkins serves on a number of charitable boards, advisory boards and contributes publicly on leadership with

11

purpose, social entrepreneurship, diversity and innovation. Dr. Jenkins graduated with a degree in medicine from St. Bartholomew's Hospital in the University of London and subsequently trained in cardiovascular medicine in the U.K. National Health Service. Earlier in her career, Dr. Jenkins served as a Medical Officer in the British Royal Navy during the Gulf Conflict, achieving the rank of Surgeon Lieutenant Commander.

We believe Dr. Jenkins is qualified to serve as a director of our Company based on her industry experience and her executive experience with companies in our industry.

**Defendant Schwab**

34.    Defendant Schwab has served as a Company director since August 2023.

35.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schwab made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| August 21, 2025 | 60,956 | $3.57 | $217,612.92 |
| August 22, 2025 | 170,449 | $3.42 | $582,935 |

Thus, in total, before the truth emerged, Defendant Schwab sold 231,405 shares of Company common stock on inside information, for which he received approximately $800,548 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36.    The 2025 Proxy Statement stated the following about Defendant Schwab:

***Andrew J. Schwab*** has served on our Board of Directors since the closing of our merger with Bird Rock Bio in August 2023 . Mr. Schwab is a Founding Partner and Managing Member of 5AM Venture Management, LLC, a venture capital firm focused on next generation life science investments founded in 2002. At 5AM, Mr. Schwab has led the firm's investments in and currently also serves on the Board of Directors of Camp4 Therapeutics Corporation since March 2021, Fellow Health, Inc. since August 2022, Radionetics Oncology, Inc. since September 2021, Rarecyte, Inc. since

December 2019, Scientist.com since November 2019, and TMRW Holdings, LLC since December 2019. Mr. Schwab previously served on the Board of Directors of Enliven Therapeutics, Inc. from January 2022 to June 2023, Escient Pharmaceuticals, Inc. (acquired by Incyte Corporation) from March 2018 to May 2024, Nido Biosciences, Inc. from August 2019 to August 2020, Novome Biotechnologies, Inc. from March 2018 to June 2024, Pear Therapeutics, Inc. from June 2014 to June 2022, and 5:01 Acquisition Corp. from September 2020 to October 2022. Mr. Schwab holds a B.S. degree with Honors in Genetics & Ethics from Davidson College.

We believe Mr. Schwab is qualified to serve as a director of our Company because of his vast investment experience, and his extensive experience in management positions and on the boards of companies in the life sciences industry.

**Defendant Smith**

37.    Defendant Smith has served as a Company director since July 2024 and also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Smith:

***Karen L. Smith, M.D., Ph.D., M.B.A., L.L.M.***, has served on our Board of Directors since July 2024. Dr. Smith is a life sciences thought leader with over 20 years of biopharmaceutical experience bringing drugs into the clinic and through commercialization. She has been a key contributor to the successful development of multiple FDA and EMA approved products in several therapeutic areas, including oncology (Herceptin, Vyxeos), rare disease (Defitelio), cardiology (Irbesartan), dermatology (Voluma, Botox), neuroscience (Abilify) and anti-infectives (Teflaro). Since November 2018, Dr. Smith has been providing consulting services internationally. Dr. Smith most recently served as Chief Medical Officer for Quince Therapeutics, Inc./Novosteo, Inc., a private biopharmaceutical company from January 2022 to September 2023, having previously served as Chief Medical Officer for Emergent BioSolutions, Inc. from April 2020 to December 2021. From May 2019 to January 2020, Dr. Smith served as President and Chief Executive Officer of Medeor Therapeutics, Inc., a biotechnology company. From June 2018 to May 2019, Dr. Smith served as Chief Executive Officer of Eliminate Cancer, Inc. From April 2015 to May 2018, she served as the Global Head of Research & Development and Chief Medical Officer of Jazz Pharmaceuticals plc, a biopharmaceutical company, where she built the R&D function into a pipeline of neuroscience and oncology products across all stages of discovery

and development. From 2011 to 2015, she was Senior Vice President, Global Medical Affairs and Global Therapeutic Area Head (Dermatology) for Allergan, Inc., a multi-specialty health care company. Earlier in her career, she held senior leadership roles at AstraZeneca plc and Bristol Myers Squibb Company. Dr. Smith holds several degrees, including an M.D. from the University of Warwick, a Ph.D. in oncology from the University of Western Australia, an M.B.A. from the University of New England and an L.L.M. (Masters in Law) from the University of Salford. Dr. Smith serves on the board of directors of Sangamo Therapeutics, Inc. (Nasdaq: SGMO), Aurinia Pharmaceuticals, Inc. (Nasdaq: AUPH), a public pharmaceutical company, Context Therapeutics Inc. (Nasdaq: CNTX) and another private biotechnology company. Dr. Smith previously served on the board of directors of Talaris Therapeutics, Inc., a public biotechnology company from June 2022 to October 2023, Antares Pharma, Inc., a public pharmaceutical company from March 2019 to May 2022, Acceleron Pharma, Inc., a public biopharmaceutical company from November 2017 to December 2021, Sucampo Pharmaceuticals, Inc. from July 2017 to February 2018, and Forward Pharma A/S, from June 2016 to June 2017, and serves as the chair of the Strategic Advisory Board of Emyria Limited, a healthcare technology and services company.

We believe Dr. Smith is qualified to serve as a director of our Company based on extensive executive experience in global research and development and tenure on prior public company boards.

**<u>Defendant Twitty</u>**

39.    Defendant Twitty has served as the Company's CSO since December 2022.

40.    The 2025 Proxy Statement stated the following about Defendant Twitty:

***Chris Twitty, Ph.D.***, was appointed as the Company's Chief Scientific Officer in December 2022. From October 2021 to December 2022, Mr. Twitty served as Chief Scientific Officer at Onchilles Pharma, a biotech company developing novel immunotherapeutics to treat various cancers. From 2018 to October 2021, Dr. Twitty served as Vice President of Research and Development and Chief Scientific Officer at OncoSec Medical, Inc. (NASDAQ:ONCS), a biopharmaceutical company developing cancer immunotherapies for the treatment of solid tumors a biotech, where he led multiple scientific teams to drive innovative preclinical research and clinical biomarker programs. Dr. Twitty has over 20 years of experience in drug development, leading early R&D discovery, and IND submissions establishing novel clinical biomarker programs. These efforts involve initiating and managing productive scientific collaborations, as well as

building and training multifunctional scientific teams. Dr. Twitty received his bachelor's degree in molecular biology from San Diego State University and his Ph.D. in molecular microbiology and immunology from Oregon Health Sciences University while training with Dr. Bernard Fox.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

41.    By reason of their positions as officers, directors, and/or fiduciaries of Skye Bioscience and because of their ability to control the business and corporate affairs of Skye Bioscience, the Individual Defendants owed Skye Bioscience and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Skye Bioscience in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Skye Bioscience and its shareholders to benefit all shareholders equally.

42.    Each director and officer of the Company owes to Skye Bioscience and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Skye Bioscience, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of Skye Bioscience were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein

Verified Shareholder Derivative Complaint

involves a knowing and culpable violation of their obligations as directors and officers of Skye Bioscience, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

46.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Skye Bioscience were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California and the United States, and pursuant to Skye Bioscience's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Skye Bioscience conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Skye Bioscience and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Skye Bioscience's operations would comply with all applicable laws and Skye Bioscience's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.     Each of the Individual Defendants further owed to Skye Bioscience and the shareholders the duty of loyalty requiring that each favor Skye Bioscience's interest and

that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Skye Bioscience and were at all times acting within the course and scope of such agency.

50.    Due to their advisory, executive, managerial, directorial, and controlling positions with Skye Bioscience, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Skye Bioscience.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (3) artificially inflate the Company's stock price.

Verified Shareholder Derivative Complaint

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Skye Bioscience was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Skye Bioscience and was at all times acting within the course and scope of such agency.

## SKYE BIOSCIENCE'S CODE OF CONDUCT

57.    Skye Bioscience's Code of Business Conduct and Ethics (the "Code of Conduct") represents that it "applies to the Company's employees, officers, and directors (collectively, the 'Company Personnel')." With respect to its purpose, the Code of Conduct states:

This Code is designed to deter wrongdoing and to promote:

• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• full, fair, accurate, timely, and understandable disclosure in the reports and documents the Company files with, or submits to, the Securities and Exchange Commission ("SEC") and in other public communications made by the Company;

• compliance with applicable governmental laws, rules, and regulations;

• ethical, transparent, and appropriate interactions with healthcare providers, patients, and other third parties and appropriate communication with third parties about Company products and the diseases and medical conditions for which they are being studied or are approved to treat;

• the protection of the Company's assets, including corporate opportunities and confidential information;

• fair dealing practices;

• the prompt reporting to the appropriate person or persons of violations or alleged violations of this Code; and

• accountability for adherence to this Code.

58.     In the section titled "Compliance and Reporting," under the subsection "Compliance," the Code of Conduct states:

Any Company Personnel who violate the provisions of this Code may be subject to disciplinary action, up to and including termination or removal from office. The Company will not tolerate the violation of laws and regulations applicable to its business and underlying this Code. Such violations by Company Personnel will be dealt with swiftly and may require the Company to refer such violation(s) for criminal prosecution or civil action.

59.     In the same section, under the subheading "Reporting Procedures and Other Inquiries," the Code of Conduct states, in relevant part:

The Company supports, and has taken efforts to foster, a "speak up" culture and is providing anonymous reporting procedures so that Company Personnel may disclose genuine concerns without feeling threatened. The Company prohibits any retaliation or retribution against any Company Personnel who in good faith submits a report under this Code. The Company will keep

Verified Shareholder Derivative Complaint

confidential to the extent permissible under applicable law, and consistent with an effective investigation, all communications with a reporting individual relating to the individual's report.

All reports of an alleged prohibited action made under this Code in good faith will be taken seriously. After receiving a report of an actual or possible violation of the provisions of this Code, the Committee (if the report involves directors, executive officers, or the General Counsel) or the General Counsel (if the report involves anyone other than a director, executive officer, or the General Counsel) must promptly take all appropriate actions necessary to investigate. Company Personnel are expected to cooperate in any such investigation.

60.     In the section "Waivers: Amendments: Interpretation," the Code of Conduct states, in relevant part:

Each of the Committee (in the case of a violation of this Code by a director, executive officer, or the General Counsel) and the General Counsel (in the case of a violation of this Code by any other person) may, in its discretion, waive any violation of this Code. Any waiver for a director or an executive officer shall be disclosed as and to the extent required by SEC and Nasdaq rules.

61.     In the section "Business Relationships and Fair Dealing," the Code of Conduct states, in relevant part:

The Company seeks to outperform its competition fairly and honestly. The Company seeks competitive advantages through superior performance, not unethical or illegal business practices. Company Personnel must deal fairly with the Company's customers, suppliers, competitors, employees, and anyone else with whom they have contact in the course of performing their job and must not take advantage of them through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair-dealing practice.

62.     Moreover, in a section titled "Insider Trading," the Code of Conduct states in relevant part:

Company Personnel who have access to material non-public information are not permitted to use such information for their personal benefit or the benefit of others or share that information for stock trading purposes or for any other purpose, except to conduct the Company's business.

63.    In a section titled "Public Reporting," the Code of Conduct states, in relevant part:

Full, fair, accurate, timely, and understandable disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications.

Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.

64.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## SKYE BIOSCIENCE'S AUDIT COMMITTEE CHARTER

65.    Skye Bioscience also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following, in relevant part, regarding the purpose of the Audit Committee:

The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

The audit committee (the "Committee") of the Board of Directors (the "Board") of Skye Bioscience, Inc., a Nevada corporation (the "Company"), is appointed by the Board for the purpose of overseeing the Company's

Verified Shareholder Derivative Complaint

accounting and financial reporting processes and the audits of the Company's financial statements. In so doing, the Committee shall endeavor to maintain free and open communication between the Company's directors, independent registered public accounting firm and financial management. The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

66.    In the section titled "Duties & Responsibilities," the Audit Committee Charter states the following, in relevant part:

A. Financial Statement & Disclosure Matters

1.  Review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with GAAP and applicable rules and regulations of the U.S. Securities and Exchange Commission (the "SEC") and NASDAQ;

2.  Oversee the Company's accounting and financial reporting processes;

3.  Oversee audits of the Company's financial statements;

4.  Review with the Company's independent registered public accounting firm, management and internal auditors any information regarding "second" opinions sought by management from any other accounting firm with respect to the accounting treatment of a particular event or transaction;

5.  Review and discuss reports from the Company's independent registered public accounting firm regarding: (a) all critical accounting policies and practices to be used by the Company; (b) all alternative treatments of financial information within GAAP that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent registered public accounting firm; and (c) other material

written communications between the independent registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

6. Review all certifications required to be made by the Company's principal executive officer and principal financial officer in connection with the Company's periodic reports under the Act or pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act;

7. Review with management and the Company's independent registered public accounting firm the Company's financial statements (including disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations") prior to the filing with the SEC of any report containing such financial statements;

8. If deemed appropriate, recommend to the Board that the Company's audited financial statements be included in its annual report on Form 10-K for the last fiscal year; and

9. Prepare and approve the report required by the rules of the SEC to be included in the Company's annual proxy statement in accordance with the requirements of Item 7(b) of Schedule 14A and Item 407 of Regulation S-K.

67. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

68.    Skye Bioscience is a clinical-stage biotechnology company that develops new mechanisms, drugs, and treatments targeted at treating obesity and related metabolic conditions and diseases. The Company's lead product candidate is nimacimab which is a peripherally restricted CB1 inhibitor.

69.    On August 22, 2024, the Company initiated its Phase 2a proof-of-concept clinical trial, "CBeyond." The CBeyond clinical trial was randomized, double-blind, and placebo controlled. It spanned twenty-six weeks and included a thirteen-week follow-up. CBeyond's primary endpoint was to show an 8% difference in mean weight loss using nimacimab compared to the placebo. CBeyond's secondary endpoints included assessments of safety and tolerability, neuropsychiatric and cognitive evaluations, and body composition changes. Moreover, CBeyond's exploratory endpoints assessed the outcomes of the combination of nimacimab and a GLP-1 agonist.

70.    Throughout the Relevant Period, Individual Defendants asserted that the CBeyond clinical trial outcomes would likely be favorable based on nimacimab's purported efficacy and primary mechanism of action, demonstrated in other studies. The Individual Defendants further overstated nimacimab's clinical, regulatory, and commercial prospects.

### False and Misleading Statements

### *November 4, 2024 Press Release*

71.    The Relevant Period began on November 4, 2024 when the Company issued a press release (the "November 2024 Press Release") that announced its preliminary data from a diet-induced obesity ("DIO") model in mice. The November 2024 Press Release stated, in relevant part, that "[p]eripherally-restricted nimacimab achieve[d] significant dose-dependent weight loss, fat mass reduction, lean mass preservation, and glycemic control in [DIO] model[.]" It also noted that the "[p]reliminary data shows that nimacimab

achieves desired metabolic outcomes[.]

### November 7, 2024 Press Release, Form 10-Q, and Earnings Call

72.     On November 7, 2024, the Company announced its financial results for its third quarter ended on September 30, 2024 in a press release ("Q3 2024 Press Release"). In the Q3 2024 Press Release, Defendant Dhillon was quoted as stating the following, in relevant part:

> The third quarter marked an important transition for Skye as a metabolic-focused company with the launch of our Phase 2 obesity clinical trial for nimacimab. ***We believe our truly peripherally restricted CB1 inhibitor has the differentiated attributes necessary to realize the unique benefits of this class of drug within the overall obesity landscape*** . . . . We also recently announced new preclinical data from a [DIO] model in mice. ***Nimacimab achieved significant dose-dependent weight loss of up to 16% compared to vehicle, highlighting the prominent role of peripherally-driven CB1 inhibition to induce weight loss and other metabolic benefits without relying on central CB1 inhibition and its risk of neuropsychiatric adverse events.***

73.     On the same day, the Company filed a Form 10-Q reporting its financial performance for the same period ("Q3 2024 Form 10-Q"). The Q3 2024 Form stated the following, in relevant part:

> During November 2024, we shared initial data from our DIO study with nimacimab ***showing dose-dependent weight loss as well as positive changes in body composition and glycemic control upon treatment***. Further analysis and repeat studies are underway but we believe that true peripheral CB1 inhibition can positively impact metabolic disorders including obesity.
>
> ***Given the distinct mechanism and beneficial attributes of nimacimab as a peripheral CB1 inhibitor, within the large and heterogeneous obesity landscape we believe there is significant opportunity for nimacimab to potentially complement GLP-1 agonists and other anti-obesity drug mechanisms of action as well as to have a potential role as a monotherapy***.

74.     Defendants Dhillon and Arsenault also signed the Sarbanes-Oxley Act of 2002 ("SOX") certifications, which were attached as exhibits to the Q3 2024 Form 10-Q.

In the SOX certifications, Defendants Dhillon and Arsenault certified that the Q3 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

75.    Moreover, the same day, the Company hosted an earnings call to discuss the Company's financial results and performance ("Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, Defendant Dhillon stated the following:

> *[W]e believe nimacimab's first-in-class profile as a perfectly targeting CB1 inhibitor offers the right combination of efficacy and safety* that position it to realize a significant opportunity for CB1 inhibition to drive meaningful dose and weight loss, fat mass reduction and lean mass preservation, improve glycemic control and weight loss, and achieve other metabolic benefits[.]"

76.    During the question-and-answer portion of the Q3 2024 Earnings Call, an analyst asked about preclinical data the Company had recently presented at another event. Defendant Dhillon responded to this question, stating that "the key takeaway is that, ***there's really strong preclinical efficacy of nimacimab[.]***" He further added that "[i]t's [nimacimab] demonstrating a significant dose dependent weight loss and it's shown this improvement in terms of glucose metabolism, as well as lean mass preservation[,] . . . ***point[ing] towards a favorable impact on body composition as well.***"

### March 20, 2025 Press Release, Form 10-K, and Earnings Call

77.    On March 20, 2025, the Company issued a press release announcing its financial results for its fourth quarter and full year ended on December 31, 2024 ("Q4 2024 Press Release"). The Q4 2024 Press Release stated, in relevant part, that the "[i]nitial data from our [DIO] model in mice released in November 2024 . . . ***supports our hypothesis that nimacimab's peripherally-targeted CB1 inhibition drives significant weight loss and improved metabolic parameters, consistent with the compound's differentiated mechanism of action.***"

78.    Defendant Dhillon, in the Q4 2024 Press Release, was quoted as stating:

Skye's prime accomplishment in 2024 was the initiation and rapid advancement of its comprehensive Phase 2a clinical study of nimacimab . . . . *We believe nimacimab's product profile is well-positioned to potentially fulfill critical unmet needs in this rapidly evolving therapeutic area.*

* * *

We surpassed our enrollment target ahead of schedule and have to-date executed the Phase 2a clinical plan on target and within our budget. *We disclosed preclinical data in November 2024 which achieved significant dose-dependent weight loss, significant fat mass loss with lean mass preservation, and dose-dependent improvement in glucose tolerance. These outcomes are indicative of the potentially compelling attributes of Skye's highly peripherally-restricted CB1 inhibitor.*

79.    On the same day, the Company also filed with the SEC a Form 10-K for 2024 ("2024 Form 10-K"). The 2024 Form 10-K stated the following, in relevant part:

*We believe nimacimab stands apart from GLP-1's and other incretin-based weight loss therapies because its primary mechanism goes beyond suppression of food intake.* While peripheral CB1 inhibition can reduce elevated leptin levels as well as modulate appetite-regulating hormones to broadly blunt appetite, key additional drivers of weight loss include increased energy expenditure, fat metabolism, and insulin sensitivity as well as reduced inflammation. *As a result, clinical data from this class of drugs have demonstrated not only weight loss but also lean mass preservation, improved insulin sensitivity, and reductions in cholesterol. Additionally, preclinical obesity models using CB1 inhibitors have shown improvements in hyperleptinemia, leptin sensitivity, and increased energy expenditure. This unique mechanism offers a potential alternative, and even complementary, approach to chronic weight management, broadening therapeutic options for patients with obesity and overweight.*

80.    The 2024 Form 10-K also emphasized the purported efficacy of nimacimab's differentiated primary mechanism of action, stating, in relevant part:

Nimacimab functions as a negative allosteric modulator of CB1, which means it binds to a distinct area of CB1 'away' from the receptor's primary active site (the orthosteric site) *and thus inhibits CB1 activity without any*

***competition from the endogenous ligands (endocannabinoids). This noncompetitive mode of action is distinct from small-molecule inhibitors,*** which target CB1 receptor's orthosteric site and require successful competition with endocannabinoids for receptor occupancy to inhibit CB1 signaling. This can become critical as CB1 signaling is often overactive in metabolic diseases, and direct competition with an inverse agonist may be insufficient in tissues with excessive CB1 activity. In such disease states, where both CB1 receptor density and endocannabinoid levels are elevated, orthosteric small molecules must outcompete high concentrations of endocannabinoids, which can negatively impact their Pharmacokinetic ("PK") profile and ultimately limit their efficacy.

81.    Attached as exhibits to the 2024 Form 10-K were SOX certifications signed by Defendants Dhillon and Arsenault, which were substantively the same as the SOX certifications included in the Q3 2024 Form 10-Q and referenced in ¶74.

82.    Moreover, on the same day, the Company hosted an earnings call to discuss its fourth quarter and full year financial results ("Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Dhillon highlighted "[the Company's] demonstration that nimacimab can drive significant weight loss in a [DIO] mirroring model[.]" Defendant Dhillon further added that the Defendants "look forward to sharing even more data that demonstrates the ability of nimacimab to not only drive weight loss, but also impact multiple metabolic processes associated with obesity and its comorbidity[,]" and that "to date, nimacimab's truly peripheral mechanism has demonstrated meaningful weight loss [.]"

***April 15, 2025 Press Release***

83.    On April 15, 2025, the Company published a press release announcing preclinical data for nimacimab in a murine DIO model ("April 2025 Press Release"). The April 2025 Press Release stated, in relevant part, that "after 25 days of treatment, results demonstrated . . . [g]reater than 30% weight loss when nimacimab was combined with the dual GLP-1/GIP agonist, tirzepatide[.]" The April 2025 Press Release further stated that "[n]imacimab alone demonstrated 23.5% weight loss, comparable to monlunabant and tirzepatide alone."

84.    In the April 2025 Press Release, Defendant Dhillon was quoted as stating:

*This new preclinical study highlights that a truly peripherallyrestricted CB1 inhibitor—nimacimab—effectively drives weight loss in a DIO model. Nimacimab compared favorably to and provided significant additive weight loss when combined with GLP-1-targeted drugs like tirzepatide* . . . . Using higher doses, this study builds on our previous preclinical DIO data in human CB1 knock-in mice that showed significant dose-dependent weight loss. *Biomarker analyses demonstrated that nimacimab-driven weight loss was associated with beneficial changes in key hormones, glycemic control, and inflammatory markers.*

[]Skye believes *nimacimab shows potential both as a monotherapy and in combination with a GLP-1 targeted drug to address unmet needs in obesity with the potential to change weight loss standards of care.* Initial data from Skye's Phase 2a study in obesity is expected in late Q3/early Q4 2025.[]

85.    Defendant Dhillon was further quoted as stating:

The second key finding of this animal study is that Skye's highly-peripherally restricted nimacimab drives efficacy similar to a less-peripherally restricted CB1 inhibitor, monlunabant, in a DIO model. *These in vivo data continue to support our belief that our differentiated antibody approach can potentially provide meaningful efficacy[.]*

### *May 8, 2025 Press Release, Form 10-Q, and Earnings Call*

86.    On May 8, 2025, the Company published a press release announcing its financial results for the period ended on March 31, 2025 ("Q1 2025 Press Release"). The Q1 2025 Press Release also included a section titled "Highlight [of] Nimacimab Differentiation in Obesity[.]" The Q1 2025 Press Release stated, in relevant part, that "[n]imacimab in combination with tirzepatide improves weight loss effect over tirzepatide alone, and shows comparable weight loss to monlunabant tirzepatide alone in preclinical [DIO] model[.]" It further added that "[i]n vitro data reported from new preclinical study highlights superior potency of . . . nimacimab[] versus monlunabant when test under pathological levels of CB1 agonists[.]"

87.    In the Q1 2025 Press Release, Defendant Dhillon was also quoted as stating:

Nimacimab continues to demonstrate a differentiated profile as a potential weight loss therapy, with a peripherally restricted mechanism that may set it apart from both GLP-1s and small-molecule CB1 inhibitors. *We're advancing a body of preclinical and clinical evidence that supports its potential in reshaping the treatment landscape in obesity.*

88.    The same day, the Company filed a Form 10-Q for the above-mentioned period ("Q1 2025 Form 10-Q"). The Q1 2025 Form 10-Q stated the following, in relevant part:

> During the three months ended March 31, 2025, we announced preclinical data *supporting our hypothesis that . . . nimacimab[] is able to drive similar efficacy when compared to a less-peripherally restricted CB1 inhibitor, monlunabant, in a [DIO] murine model.* The results of the preclinical DIO study *demonstrated greater than 30% weight loss when nimacimab was combined with the dual GLP-1/GIP agonist, tirzepatide. Nimacimab alone demonstrated 23.5% weight loss, which is comparable to monlunabant and tirzepatide alone in this study.*
>
> *We also shared in vitro potency data demonstrating that nimacimab's non-competitive allosteric binding to CB1 provides potential advantages over orthosteric-binding small-molecule drugs.* Binding to a different site on the receptor, nimacimab does not compete with natural CB1 agonists such as anandamide (AEA) and 2- arachidonoylglycerol (2-AG). It can block CB1 activity even with an elevated concentration of CB1 agonists, which is associated with obesity. In contrast, orthosteric-binding small molecule inhibitors must compete with CB1 agonists for binding at the receptor's orthosteric site, which was shown to negatively impact potency when tested under elevated CB1 agonist concentrations. *This distinction may give nimacimab a wider therapeutic window, with suitable potency at lower doses and less side effects.*
>
> *Given the distinct mechanism and beneficial attributes of nimacimab as a peripheral CB1 inhibitor, within the large and heterogeneous obesity landscape we believe there is significant opportunity for nimacimab to potentially complement GLP-1 agonists and other anti-obesity drug mechanisms of action as well as to have a potential role as a monotherapy.*

89.    Attached as exhibits to the Q1 2025 Form 10-Q and signed by Defendants Dhillon and Arsenault were SOX certifications substantively the same as the SOX certifications included in the Q3 2024 Form 10-Q.

Verified Shareholder Derivative Complaint

90.    Furthermore, on the same day, the Company hosted an earnings call to discuss its financial results ("Q1 2025 Earnings Call"). Defendant Dhillon, during his prepared remarks on the call, stated that:

> [W]e generated compelling new preclinical data that further validates the potential of nimacimab as a weight loss therapy. Nimacimab continues to stand out with a differentiated mechanism that is distinct from both peripherally restricted small-molecule CB1 inhibitors and GLP-1 agonists. Importantly, our recent preclinical studies demonstrated a truly peripherally restricted antibody like nimacimab can potentially result in significant weight loss similar to a less restricted small molecule and nimacimab has the potential to provide additive weight loss to an incretin mimetic like tirzepatide.

* * *

> ***These findings reinforce our belief that nimacimab has the potential to deliver durable weight loss[.]***

91.    During the Q1 2025 Earnings Call, Defendant Twitty also highlighted the outcomes of the Company's DIO studies and emphasized nimacimab's purported efficacy, stating that:

> Recent biomarker analyses from our initial mouse DIO study have ***further extended the impact of the dose-dependent weight loss observed with nimacimab treatment. Specifically, now we can report nimacimab-dependent reduction in fasting insulin levels that complement significant glycemic control as well as productive modulation of key appetite-regulating hormones including GLP-1 and leptin.***
>
> ***Additional data sets also highlighted significant reduction of inflammation in adipose tissue as well as liver steatosis.*** We are also happy to report that this initial study has now been repeated by an independent lab ***with very reproducible results not only in terms of the magnitude of weight loss and body composition that is preservation of lean mass with significant reduction of fat mass, but also with positive changes in glycemic control.***
>
> This repeat study also looked carefully at food consumption and ***noted a significant reduction in cumulative caloric intake slightly less but in line with Semaglutide. Collectively, these studies highlight that Nimacimab-dependent efficacy is driven by multiple peripheral pathways coordinated***

*through different organ systems.*

92.    Defendant Twitty further added that the results of the Company's other studies "[] combined with our mechanistic data strongly support the potential for Nimacimab to be effective as both a Monotherapy and as part of a combination approach to address the growing obesity epidemic[.]" He further asserted that "***in vivo studies continue to support our belief that our differentiated antibody approach can provide meaningful efficacy[,]***" and "***[t]hese data suggest that Nimacimab may offer the widest possible therapeutic window among CB1 inhibitors potentially delivering significant metabolic benefits[.]***"

93.    During the question-and-answer portion of the Q1 2025 Earnings Call, analysts asked about how the Company's preclinical studies affected and shaped the Individual Defendants and the Company's confidence in the projected topline results from the CBeyond clinical trial. Defendant Dhillon assured investors in his response that, "across the board it [the Company's preclinical studies] checks a lot of boxes" and further that "[o]f course it gives you this aspect of well we feel more confident around the mechanism and there's this component that comes along with it that we expect it to translate into the clinic."

94.    In response to the same question, Defendant Twitty overstated the ability to successfully predict nimacimab's efficacy with the Company's preclinical results. In particular, he stated the following, in relevant part:

> So when you look at that all together, you really start to appreciate how we're matching exposure and ***we're looking at doses that are we feel very translatable. And we've seen some success with predicting efficacy in the interim space*** and arguably looking at the CB1 space with Novo's data set which we feel is actually a pretty significant data set. This is actually a very I think a very strong data set and they too had DIO data that looked pretty strong. ***We reproduced that in our own lab. So coming back to this idea of translating we do feel pretty confident that we're going to have an active drug in the clinic.***

***June 23, 2025 Press Release***

95.    On June 23, 2025, the Company published a press release ("June 2025 Press

Release") announcing its nimacimab development update video series titled "*Anatomy of Progress*." The June 2025 Press Release also announced the availability of presentations related to the development of nimacimab. Defendant Dhillon was also quoted in the June 2025 Press Release as stating, in relevant part:

> Unlike the small molecule CB1 inhibitors currently in development, ***nimacimab's differentiating peripheral restriction has the potential to demonstrate the same weight loss and metabolic benefits previously seen in clinical trials by first-generation CB1 inhibitors***, without the significant neuropsychiatric liabilities that continue to plague its small molecule counterparts. ***So nimacimab is not just another anti-obesity drug, it represents a new frontier in how we think about fat metabolism, safety and long-term care.***

### August 7, 2025 Press Release, Form 10-Q, and Earnings Call

96.    On August 7, 2025, the Company published a press release reporting its financial results for the period ended on June 30, 2025 ("Q2 2025 Press Release"). The press release stated, in relevant part, that a "[n]ew preclinical study highlights [the] superior weight rebound profile of nimacimab compared to incretin therapy[.]"

97.    The Q2 2025 Press Release further stated that "[p]reclinical data shows dosing nimacimab in combination with a low dose of tirzepatide resulted in enhanced weight loss compared to an optimal does of tirzepatide[,]" and that when "[u]sed as a maintenance treatment, a preclinical study of nimacimab reduced the weight rebound effect observed in mice treated with tirzepatide alone or in combination with nimacimab."

98.    Defendant Dhillon was also quoted in the Q2 2025 Press Release as stating the following, in relevant part:

> We believe nimacimab's peripherally-restricted CB1 mechanism represents a fundamentally different approach, ***one that could offer real-world advantages as a monotherapy or in combination***, without compounding gastrointestinal side effects. As the market evolves, we see a growing need for therapies that deliver broader metabolic benefit, improved persistence, and combinability and ***we believe nimacimab is uniquely positioned to help define this next chapter in obesity care.***

99.    On the same day, the Company filed a Form 10-Q for the above mentioned period ("Q2 2025 Form 10-Q"). The Q2 2025 Form 10-Q stated the following, in relevant part:

> We recently shared new data from a preclinical [DIO] mouse model ***which provides further evidence for the potential combination of nimacimab with incretins and demonstrated the potential durability of response with nimacimab as a monotherapy or maintenance therapy post-incretin treatment*** . . . . The preclinical DIO study also demonstrated that, ***when used as a monotherapy, nimacimab-driven weight loss persisted for about 20 days after treatment cessation, while mice treated with tirzepatide alone regained most of their lost weight within a week post-treatment.*** Lastly, the preclinical DIO study demonstrated that ***when nimacimab alone was used after an initial tirzepatide or combination treatment in the preclinical DIO mouse model, it reduced rebound weight gain in these groups of mice.***

100.    Attached as exhibits to the Q2 2025 Form 10-Q and signed by Defendants Dhillon and Arsenault were SOX certifications substantively the same as the SOX certifications included in the Q3 2024 Form 10-Q.

101.    Furthermore, on August 7, 2025, the Company hosted an earnings call to discuss its financial performance ("Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Dhillon stressed nimacimab's supposed "robust, reproducible and mechanistically distinct" outcomes in the Company's DIO models. In this regard, Dhillon further highlighted nimacimab's "demonstra[tion] [of] durable posttreatment weight loss compared to incretin therapy after the therapy stopped[,]" asserting that "[n]imacimab is not just an alternative" but rather "a next-generation backbone candidate for durable, combinable and more accessible obesity care[.]"

102.    Lastly, in the Q2 2025 Earnings Call, Defendant Dhillon added that nimacimab has "a platform that can potentially extend beyond monotherapy to life cycle expansion across lines of therapy and patient segments that are currently underserved by today's options."

103.    The statements in ¶¶71-102 above were materially false and misleading, and

they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the purported outcomes of the Company's other studies on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial; (2) the efficacy of nimacimab was less than the Individual Defendants claimed it to be; and (3) the Individual Defendants overstated the clinical, regulatory, and commercial prospects of nimacimab. As a result, the Individual Defendants' statements during the relevant period were materially false and misleading.

### *2025 Proxy Statement*

104.  On April 25, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Grayson, Charych, Dhillon, Jenkins, Smith, and Schwab solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained materially false and misleading statements.

105.  The 2025 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) re-elect Defendants Grayson, Charych, Dhillon, Jenkins, Smith, and Schwab to the Board; and (2) ratify the selection of Marcum LLP as the Company's independent registered public accounting firm for 2025.

106.  With respect to the Code of Conduct, the 2025 Proxy Statement stated:

The Board of Directors has established a code of business conduct and ethics that applies to our officers, directors and employees. Among other matters, our code of business conduct and ethics is designed to deter wrongdoing and to promote:

•honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
•full, fair, accurate, timely and understandable disclosure in the reports and documents the Company files with, or submits to, the SEC and in other public communications made by the Company;
•compliance with applicable governmental laws, rules and regulations;

Verified Shareholder Derivative Complaint

•the prompt internal reporting to the appropriate person of violations of the code of business conduct and ethics; and

•accountability for adherence to the code of business conduct and ethics.

Any waiver of the code of business conduct and ethics for our executive officers or directors must be approved by the Board of Directors, and any such waiver shall be promptly disclosed to the stockholders. We will disclose amendments to the code of business conduct and ethics on our website within four business days from the date of such amendment.

107. With respect to "The Board's Role in Risk Oversight," the 2025 Proxy Statement stated:

Our Board of Directors has responsibility for the oversight of our risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from Board committees and members of senior management to enable our Board to understand our risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operational, financial, market, legal, regulatory, strategic and reputational risk.

Our Audit Committee reviews information regarding liquidity and operations and oversees our management of financial risks. Periodically, our Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. Oversight by our Audit Committee includes direct communication with our external auditors, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures, including related to cybersecurity. The Compensation Committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking. The Nominating & Corporate Governance Committee manages risks associated with the independence of the Board of Directors, corporate disclosure practices, and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board of Directors is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by our Board of Directors as a whole.

108.   The 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (1) the purported outcomes of the Company's other studies on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial; (2) the efficacy of nimacimab was less than the Individual Defendants claimed it to be; and (3) the Individual Defendants overstated the clinical, regulatory, and commercial prospects of nimacimab. As a result, the Individual Defendants' statements during the relevant period were materially false and misleading.

109.   Under the direction and watch of Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab, the 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

110.   As a result of Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers.

## **THE TRUTH EMERGES**

111.   The truth emerged on October 6, 2025, when the Company published a press release that announced its topline date from its CBeyond clinical trial ("October 2025 Press Release"). The October 2025 Press Release revealed that the CBeyond clinical trial failed to meet its primary endpoint. In relevant part, the October 2025 Press Release stated the

following:

- *Nimacimab monotherapy did not meet its primary endpoint for weight loss; preliminary pharmacokinetic analysis showed lower than expected drug exposure, potentially indicating the need for higher dosing as a monotherapy.*

\* \* \*

In CBeyond™, the nimacimab monotherapy arm did not achieve the primary endpoint of weight loss compared to placebo (-1.52% vs. -0.26 for placebo, mITT1). Preliminary pharmacokinetic analysis showed an association between exposure and response, suggesting that the 200 mg, subcutaneous weekly dose was suboptimal as a monotherapy.

\* \* \*

**CBeyond™ Phase 2a Topline Results at 26 Weeks**

- **Monotherapy dosed at 200 mg demonstrated lower than expected drug exposure.** In the monotherapy arm, nimacimab 200 mg did not achieve the primary endpoint, with placebo-subtracted weight loss of -1.26% at week 26 (p=0.2699, mITT). Preliminary pharmacokinetic analysis showed lower than expected drug exposure of nimacimab, supporting evaluation of higher dosing.

(Emphases in original.)

112.  On this news, the price of the Company's stock fell $2.85 per share, or 60%, from a closing price of $4.75 on October 5, 2025, to close at $1.90 per share on October 6, 2025.

## DAMAGES TO SKYE BIOSCIENCE

113.  As a direct and proximate result of the Individual Defendants' conduct, Skye Bioscience has lost and will continue to lose and expend many millions of dollars.

114.  Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection

thereto.

115.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

116.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

117.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

118.   As a direct and proximate result of the Individual Defendants' conduct, Skye Bioscience has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

119.   Plaintiff brings this action derivatively and for the benefit of Skye Bioscience to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Skye Bioscience, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

120.   Skye Bioscience is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.   Plaintiff is, and has been at all relevant times, a shareholder of Skye Bioscience. Plaintiff will adequately and fairly represent the interests of Skye Bioscience in enforcing and prosecuting its rights, and, to that end, has retained competent counsel,

experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

122.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

123.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Skye Bioscience's Board consisted of the following six individuals: Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants that were on the Board at the time this action was filed.

124.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.   In complete abandonment of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Skye Bioscience to issue materially false and misleading statements. Specifically, the Director-Defendants caused Skye Bioscience to issue false and misleading statements which were intended to make Skye Bioscience appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.   Additional reasons that demand on Defendant Dhillon is futile follow. Defendant Dhillon has served as the Company's CEO and President since August 2020 and as a Company director since January 2018. The Company provides Defendant Dhillon

with his principal occupation for which he receives substantial compensation. Thus, as the Company admits in its 2025 Proxy Statement, Defendant Dhillon is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dhillon solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties; and (2) approve, on an advisory basis, the compensation of executive officers. Furthermore, Defendant Dhillon is a defendant in the Securities Class Action. Moreover, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Dhillon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Grayson is futile follow. Defendant Grayson has served as a Company director since August 2023 and as Chairman of the Board since October 2024. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Grayson has received and continues to receive sizable compensation for his role as a director. Additionally, Defendant Grayson solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Grayson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Charych is futile follow. Defendant Charych has served as a Company director since February 2023 and also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Charych has received and continues to receive sizable compensation for her role as a director. Additionally, Defendant Charych solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Charych breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Jenkins is futile follow. Defendant Jenkins has served as a Company director since February 2024 and also serves as the Chair of the Audit Committee. Defendant Jenkins has received and continues to receive sizable compensation for her role as a director. Additionally, Defendant Jenkins solicited the 2025 Proxy Statement, which was materially false and misleading and resulted

Verified Shareholder Derivative Complaint

in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Jenkins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since July 2024 and also serves as the Chair of the Compensation Committee. Defendant Smith has received and continues to receive sizable compensation for her role as a director. Additionally, Defendant Smith solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Schwab is futile follow. Defendant Schwab has served as a Company director since August 2023. Defendant Schwab has received and continues to receive sizeable compensation for his role as a director. Additionally, as the Company admits in its 2025 Proxy Statement, Defendant

Schwab is a non-independent director, as he is an affiliate of one of the Company's 5% beneficial owners. Moreover, Defendant Schwab solicited the 2025 Proxy Statement, which was materially false and misleading and resulted in shareholders voting, *inter alia*, to: (1) reelect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Schwab breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on the Board is futile follow.

133.    Defendants Jenkins (as Chair), Grayson, and Smith (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not

independent or disinterested, and thus demand is excused as to them.

134.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

135.   Skye Bioscience has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Skye Bioscience any part of the damages Skye Bioscience suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

136.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

137.    The acts complained of herein constitute violations of fiduciary duties owed by Skye Bioscience's officers and directors, and these acts are incapable of ratification.

138.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if there is a directors' and officers' liability insurance policy covering the Director-Defendants. The policy may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Skye Bioscience, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

139.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Skye Bioscience to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

140.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

143.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

144.   Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's preclinical trial outcomes on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial; (2) the efficacy of nimacimab was less than the Individual Defendants claimed it to be; and (3) the Individual Defendants overstated the clinical, regulatory, and commercial prospects of nimacimab. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

145.   Under the direction and watch of Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab, the 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's

description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

146. In the exercise of reasonable care, Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

147. As a result of Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dhillon, Grayson, Charych, Jenkins, Smith, and Schwab to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve, on an advisory basis, the compensation of executive officers.

148. The Company was damaged as a result of Defendants Dhillon's, Grayson's, Charych's, Jenkins's, Smith's, and Schwab's material misrepresentations and omissions in the 2025 Proxy Statement.

149. Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Skye Bioscience's business and affairs.

152. Each of the Individual Defendants violated and breached their fiduciary duties

Verified Shareholder Derivative Complaint

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

153.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Skye Bioscience.

154.   In breach of their fiduciary duties owed to Skye Bioscience, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's preclinical trial outcomes on nimacimab's efficacy and differentiated primary mechanism of action were insufficient to inform and/or predict the outcome of the Company's CBeyond clinical trial; (2) the efficacy of nimacimab was less than the Individual Defendants claimed it to be; and (3) the Individual Defendants overstated the clinical, regulatory, and commercial prospects of nimacimab. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

155.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

156.   Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $1.8 million.

157.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

158.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to

correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Skye Bioscience's securities.

159.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Skye Bioscience's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

160.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

161.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Skye Bioscience has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.   Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

163.   Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

164. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Skye Bioscience.

165. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Skye Bioscience that was tied to the performance or artificially inflated valuation of Skye Bioscience or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

166. Plaintiff, as a shareholder and representative of Skye Bioscience, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

167. Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

168. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Skye Bioscience, for which they are legally responsible.

170. As a direct and proximate result of the Individual Defendants' abuse of

control, Skye Bioscience has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

171.   Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

172.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Skye Bioscience in a manner consistent with the operations of a publicly held corporation.

174.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Skye Bioscience has sustained and will continue to sustain significant damages.

175.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

176.   Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

177.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

179.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Skye Bioscience to waste valuable corporate assets, to incur many millions of dollars of legal

Verified Shareholder Derivative Complaint

liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

180.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

181.    Plaintiff, on behalf of Skye Bioscience, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Dhillon, Arsenault, and Twitty for Contribution Under Sections 10(b) and 21D of the Exchange Act

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    Skye Bioscience and Defendants Dhillon, Arsenault, and Twitty are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Dhillon's, Arsenault's, and Twitty's willful and/or reckless violations of the obligations as officers and/or directors of the Company.

184.    Defendants Dhillon, Arsenault, and Twitty, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

185.    Accordingly, Defendants Dhillon, Arsenault, and Twitty are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186.   As such, Skye Bioscience is entitled to receive all appropriate contribution or indemnification from Defendants Dhillon, Arsenault, and Twitty.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Skye Bioscience, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Skye Bioscience;

(c)   Determining and awarding to Skye Bioscience the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Skye Bioscience and the Individual Defendants to take all necessary actions to reform and improve Skye Bioscience's corporate governance and internal procedures to comply with applicable laws and to protect Skye Bioscience and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Skye Bioscience to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)   Awarding Skye Bioscience restitution from the Individual Defendants, and

each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: January 29, 2026                    Respectfully submitted,

                                          **THE BROWN LAW FIRM, P.C.**

                                          */s/      /s/*Robert C. Moest
                                          Robert C. Moest, Of Counsel, SBN 62166
                                          2530 Wilshire Boulevard, Second Floor
                                          Santa Monica, CA 90403
                                          Telephone: (310) 915-6628
                                          Facsimile: (310) 915-9897
                                          Email: RMoest@aol.com

                                          **THE BROWN LAW FIRM, P.C.**
                                          Timothy Brown
                                          767 Third Avenue, Suite 2501
                                          New York, NY 10017
                                          Telephone: (516) 922-5427
                                          Facsimile: (516) 344-6204
                                          Email: tbrown@thebrownlawfirm.net

                                          *Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Randy Domulot, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 day of January, 2026.

Randy Domulot